IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
September 1, 2015 Session


**KHALFANI MARION v. STATE OF TENNESSEE**


**Appeal from the Criminal Court for Shelby County**
**No. 03-01051      James M. Lammey, Judge**

————————————————————


**No. W2015-00453-CCA-R3-PC  -  Filed November 20, 2015**

————————————————————


Petitioner, Khalfani Marion, was convicted of four counts of aggravated robbery, a Class B felony, and one count of especially aggravated kidnapping, a Class A felony.  After merger of the four counts of aggravated robbery into two counts of aggravated robbery, the trial court imposed consecutive sentences of twenty years for the especially aggravated kidnapping conviction and nine years for each aggravated robbery conviction. Following petitioner's unsuccessful direct appeal, he filed a petition for post-conviction relief.  The post-conviction court held an evidentiary hearing and denied relief. Appealing therefrom, petitioner raises eight instances of ineffective assistance of counsel:  (1) whether trial counsel reasonably investigated petitioner's case; (2) whether trial counsel erred in failing to file a motion to sever petitioner's case from his codefendants; (3) whether trial counsel erred by failing to have petitioner sentenced under the 1989 Sentencing Act as written prior to the 2005 amendments; (4) whether trial counsel failed to object to the trial court's decision not to instruct the jury on facilitation; (5) whether trial counsel erred by failing to introduce evidence of petitioner's mental health history; (6) whether trial counsel failed to advise petitioner of the State's plea offer and sentence exposure; (7) whether trial counsel failed to impeach the State's witnesses on their identification of petitioner; and (8) whether trial counsel erred in failing to present mitigating evidence at the sentencing hearing.  Following our review, we affirm the judgment of the post-conviction court.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**


ROGER A. PAGE, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and TIMOTHY L. EASTER, JJ., joined.


Carlissa Andranette Shaw, Memphis, Tennessee, for the Appellant, Khalfani Marion.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Bryce Hulon Phillips, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### I. Facts from Trial

Elisha Wilkins testified that during the evening of May 14, 2002, she was asleep in the den of her boyfriend's house when she was awakened by a knock at the back door. *State v. Khalfani Marion*, No. W2006-02444-CCA-R3-CD, 2008 WL 2262317, at *1 (Tenn. Crim. App. June 2, 2008), *perm. app. denied* (Tenn. Dec. 1. 2008). When she looked through a window in the kitchen, a man was standing at the door. *Id.* He asked if "Chris" was home, and she responded that he was not. *Id.* The man knocked a second time. *Id.* Ms. Wilkins looked through the window and saw a taller man, armed with a gun, standing beside the first man. *Id.* Seven or eight men, most of whom were armed, then broke down the door and entered the house. *Id.* One of the men grabbed Ms. Wilkins by the hair and demanded to know where the money was located. *Id.* She informed the men that she did not know where any money was located, and the men took her truck keys, her wallet, and her identification. *Id.* Codefendant Montreal Lyons told Ms. Wilkins that she was going to die because she had seen his face and could identify him. *Id.*

The men forced Ms. Wilkins into the backseat of her truck and drove to the home of her friend, Latonya Cooper. *Id.* A burgundy van followed her truck as they left her boyfriend's house. *Id.* At Ms. Cooper's house, Lyons held a gun to Ms. Wilkins' head and ordered her to knock on the door while the other men hid from view. *Id.* When Ms. Cooper recognized Ms. Wilkins, she opened the door, and the men forcibly entered Ms. Cooper's house. *Id.* All of the men who were present at the home of Ms. Wilkins' boyfriend were also present at Ms. Cooper's house. *Id.* Ms. Cooper was permitted to close the door to her children's bedroom so they would not be awakened. *Id.* The men separated the victims, ordering Ms. Cooper into her bedroom and Ms. Wilkins into a bathroom. *Id.* The men instructed both victims that they should reveal where the money was kept because they were going to die anyway. *Id.* Lyons instructed one of the men to retrieve one of Ms. Cooper's children as inducement for the victims to surrender the money. *Id.* Codefendant Mario Morris took the victims into a bedroom and held them at gunpoint. *Id.* The men subsequently forced the victims to lie down on the living room floor, where they remained until the men left the house and Ms. Cooper's husband arrived. *Id.*

-2-

On June 8, 2002, Ms. Wilkins spotted petitioner at a bus station in Memphis and alerted police; he was then arrested. *Id.* at *2. She said that during the robbery, petitioner said that he knew all about her and threatened that she would die because she had seen the faces of her attackers. *Id.* She thought the assailants were going to kill her during the robbery, and she felt afraid. *Id.* The victim could not remember whether the petitioner was carrying a gun that night. *Id.*

Ms. Cooper testified that on May 14, 2002, she was home with her five- and six-year-old daughters when she heard the doorbell ring. *Id.* She opened the door when Ms. Wilkins identified herself. *Id.* Several armed men strode into her home and locked the door behind them. *Id.* Petitioner told her to close her daughters' bedroom door, and then the men demanded money. *Id.* Ms. Cooper explained that her purse was in her bedroom, and petitioner accompanied her to the bedroom, removed money from Ms. Cooper's purse, and searched her dresser. *Id.* Codefendant Lyons was upset that Ms. Cooper did not produce more money and threatened to kill Ms. Wilkins, Ms. Cooper, and her children.

Ms. Cooper testified that codefendants Lyons and Morris were carrying guns but that she could not recall whether petitioner was armed. *Id.* She stated that the men stole money, jewelry, a DVD player, a laptop computer, and her vehicle. *Id.* At one point, someone knocked on her door, and petitioner instructed her to open it while telling codefendant Morris to "spray her ass" if she attempted to flee. *Id.* The victims were then ordered to lie face down in the living room. *Id.* Believing she was about to be shot, Ms. Cooper begged the men to take her to a different location so that her children would not witness anything. *Id.* Codefendant Lyons told her to lie down or be shot down. *Id.* The victims complied, and the men exited through the rear door. *Id.*

Memphis Police Department Officer Larry Skaggs testified that on June 8, 2002, he was working downtown when he was approached by a woman who told him that she had seen a man at the bus station who had robbed her and burglarized her house. *Id.* He proceeded to the bus station where he located petitioner, who matched the description she had given. *Id.* Officer Skaggs arrested petitioner, and he was transported to the police station. *Id.* Memphis Police Department Lieutenant Connie Maness testified that she showed Ms. Wilkins a photograph of petitioner that night and that Ms. Wilkins confirmed that petitioner was the person who invaded her home. *Id.* Sergeant Timothy Green of the Memphis Police Department subsequently showed a six-person photographic array to Ms. Cooper, and she circled petitioner's picture, identifying him as one of her assailants. *Id.* at *3.

At the sentencing hearing, Ms. Cooper testified that the robbery had caused her to live in constant fear. *Id.* She awakened three to four times each night to check on her children and moved away from Memphis because she did not feel safe there. *Id.*

The trial court sentenced petitioner as a Range I, standard offender to nine years for the aggravated robbery of Ms. Wilkins, finding two enhancement factors: (1) petitioner had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range and (2) petitioner was a leader in the commission of an offense involving two or more criminal actors. *Id.* (citing Tenn. Code Ann. § 40-35-114(1), (2) (2006)). For the aggravated robbery of Ms. Cooper, the court sentenced petitioner as a Range I, standard offender to nine years, finding in addition to the two previous enhancement factors that petitioner treated the victim with exceptional cruelty during the commission of the offense and that he had no hesitation about committing a crime when the risk to human life was high. *Id.* (citing Tenn. Code Ann. § 40-35-114(1), (2), (5), (10)). For the especially aggravated kidnapping conviction, the court sentenced petitioner as a Range I, violent offender to twenty years, again applying the prior criminal history and leadership enhancement factors. *Id.* The court found that petitioner was a dangerous offender whose behavior indicated little or no regard for human life and that he had no hesitation about committing a crime in which the risk to human life was high and accordingly ordered consecutive alignment of all sentences, for an effective sentence of thirty-eight years. *Id.*

## II. Post-Conviction Proceedings

On September 14, 2010, petitioner filed an untimely pro se petition for post-conviction relief in which he raised a number of claims. *Khalfani S. Marion v. State*, No. W2011-00203-CCA-R3-PC, 2012 WL 601081, at *1 (Tenn. Crim. App. Feb. 22, 2012). Petitioner alleged that he had been "erroneously informed" of the status of his appeal and attached to the petition a letter from his trial counsel dated June 18, 2010, to that effect. *Id.* The post-conviction court summarily dismissed the petition on December 2, 2010, concluding that it was filed beyond the one-year statute of limitations. *Id.* Relying on *Williams v. State*, 44 S.W.3d 464, 469 (Tenn. 2001) (holding that "'an attorney's misrepresentation, either attributable to deception or other misconduct,' is 'beyond a defendant's control' and that '[i]f a defendant erroneously believes that counsel is continuing to represent him or her, then the defendant is essentially precluded from pursuing certain remedies independently'"), this court remanded the case to the post-conviction court for a determination of whether the statute of limitations should be tolled in petitioner's case. *Id.*

Thereafter, the post-conviction court granted petitioner an evidentiary hearing on the merits of his petition. The trial court held a trifurcated hearing in July, September,

and November 2014, and after consideration of the testimony and evidence, denied post-conviction relief by written order dated January 12, 2015.

## III. Analysis

Appealing from the denial of post-conviction relief, petitioner challenges whether he received effective assistance of counsel. We will address in turn the eight instances of alleged ineffectiveness: (1) whether trial counsel reasonably investigated petitioner's case; (2) whether trial counsel erred in failing to file a motion to sever petitioner's case from his codefendants; (3) whether trial counsel erred by failing to have petitioner sentenced under the 1989 Sentencing Act as written prior to the 2005 amendments; (4) whether trial counsel failed to object to the trial court's decision not to instruct the jury on facilitation; (5) whether trial counsel erred by failing to introduce evidence of petitioner's mental health history; (6) whether trial counsel failed to advise petitioner of the State's plea offer and sentence exposure; (7) whether trial counsel failed to impeach the State's witnesses on their identification of petitioner; and (8) whether trial counsel erred in failing to present mitigating evidence at the sentencing hearing. For ease of reference, the testimony from the evidentiary hearing pertinent to each allegation, together with the post-conviction court's ruling, is included under the appropriate heading.

### A. Standard of Review

To obtain relief in a post-conviction proceeding, a petitioner must demonstrate that his or her "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009)).

Appellate courts do not reassess the post-conviction court's determination of the credibility of witnesses. *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009) (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)). Assessing the credibility of witnesses is a matter entrusted to the post-conviction judge as the trier of fact. *R.D.S.*, 245 S.W.3d at 362 (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). The post-conviction court's findings of fact are conclusive on appeal unless the preponderance of the evidence is otherwise. *Berry v. State*, 366 S.W.3d 160, 169 (Tenn. Crim. App. 2011) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997)). However, conclusions of law receive no presumption of correctness on appeal. *Id.* (citing *Fields v. State*, 40 S.W.3d 450, 453

(Tenn. 2001)). As a mixed question of law and fact, this court's review of petitioner's ineffective assistance of counsel claims is de novo with no presumption of correctness. *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011) (citations omitted).

The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and article I, section 9 of the Tennessee Constitution require that a criminal defendant receive effective assistance of counsel. *Cauthern v. State*, 145 S.W.3d 571, 598 (Tenn. Crim. App. 2004) (citing *Baxter v. Rose*, 523 S.W.2d 930 (Tenn. 1975)). When a petitioner claims that he received ineffective assistance of counsel, he must demonstrate both that his lawyer's performance was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007) (citation omitted). It follows that if this court holds that either prong is not met, we are not compelled to consider the other prong. *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004).

To prove that counsel's performance was deficient, petitioner must establish that his attorney's conduct fell below an objective standard of "'reasonableness under prevailing professional norms.'" *Finch*, 226 S.W.3d at 315 (quoting *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006)). As our supreme court held:

> "[T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence . . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations."

*Id.* at 315-16 (quoting *Baxter*, 523 S.W.2d at 934-35). On appellate review of trial counsel's performance, this court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689).

To prove that petitioner suffered prejudice as a result of counsel's deficient performance, he "must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different." *Vaughn*, 202 S.W.3d at 116 (citing *Strickland*, 466 U.S. at 694). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). As such, petitioner must establish that his attorney's deficient performance was of such

-6-

magnitude that he was deprived of a fair trial and that the reliability of the outcome was called into question. *Finch*, 226 S.W.3d at 316 (citing *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999)).

### B. Ineffective Assistance of Counsel

Petitioner was represented at trial by retained trial counsel, who had thirty-two years of experience in the practice of law and who had handled over one hundred criminal trials between her roles as a prosecutor and as a defense attorney. Because petitioner's file had been destroyed, she testified at the evidentiary hearing from memory.

### 1. Failure to Investigate

Petitioner argues that the post-conviction court erroneously concluded that trial counsel reasonably investigated his case.

Petitioner testified that his family retained trial counsel to represent him. She allegedly told petitioner's parents that her husband was the prosecutor in that division of criminal court and that they should not inform petitioner of their relationship because it was a conflict of interest. Petitioner claimed that accordingly, trial counsel felt that she did not have to conduct an independent investigation and that petitioner had no reason to be concerned because her husband was the assistant district attorney and she would secure an acquittal. Petitioner testified that he requested that trial counsel present the testimony of a particular witness but that she responded that there was "no need because her husband was the prosecutor of the case." Petitioner said that he insisted on trial counsel's calling his witness but that she failed to interview him, did not attempt to contact him, and did not instruct a private investigator to reach him because she "thought she had it all figured out because her husband was the prosecutor of the case."

Petitioner recalled that trial counsel's husband became the judge of that criminal division and that his case was subsequently transferred to a different division for trial. He wanted trial counsel to call Bryant Adair, Jocelyn Parker, Dorothy Marion, his father, his mother, and his sister, Tiffany, as witnesses. He also wanted his records from the Memphis Mental Health Institute ("MMHI") introduced as evidence. However, he said that trial counsel told him that it was "too late" and that she could do nothing about it. Petitioner stated that Mr. Adair was incarcerated at the time, so he would have been easy to locate and interview. Petitioner admitted, "I have no knowledge about if she tried to contact anyone[,] but she never told me that she tried to contact anyone." Petitioner claimed that he learned about trial counsel's marital relationship years after his trial.

-7-

Petitioner maintained that Bryant Adair was willing to testify on his behalf despite the probability that he would have been impeached with his guilty plea to practically the same offenses of which petitioner stood convicted. Another of petitioner's possible witnesses, Jocelyn Parker, was also convicted for her participation in the offenses. He agreed that Ms. Parker was an ex-girlfriend and understood that the prior relationship could have been presented as a reason to lie or exhibit bias. Petitioner said that he understood that whether he testified at trial was a tactical decision and that the ultimate decision was up to him. He restated that trial counsel's husband was the prosecutor "specifically" assigned to his case even after trial counsel was retained.

Trial counsel emphasized that she always told her clients that she was married to a prosecutor and denied that she told petitioner that she "had it covered" because of it. Some of her clients had told her previously that having her represent them was the best thing they ever did because it prevented her husband from "touching" their case; he had a reputation of being a "tough prosecutor."

With regard to trial preparation, trial counsel did not recall in what year she began preparing for petitioner's trial. She remembered meeting petitioner's parents, whom she described as "extremely kind people" who were "terribly worried about their son." She recalled that she received the case when it was in criminal court. It was in the same division of criminal court where her husband was a prosecutor, but she clarified that their cases "never overlapped." If he was ever assigned a case involving someone she represented, the case was transferred elsewhere. Upon her husband's election to the bench, the case was transferred to another division. Although petitioner's case was not transferred out of that division until the day of trial, trial counsel emphasized that her husband was not involved in any aspect of the case and that "frankly, [the prosecutor] was an ex[-husband] then."

Trial counsel confirmed that she met with petitioner several times in addition to meeting with him during court proceedings. She also met with his family. She summarized her case investigation of petitioner's case, saying that she utilized the things that were available to her, which "panned out to be very little." Petitioner provided her with the names of individuals who were incarcerated and a witness who could not be located. Petitioner had two codefendants at trial, but no one would testify. She recalled that there were additional codefendants prior to trial but that she was not involved in petitioner's case at that point. While petitioner gave her two names of witnesses to call, one witness was Mr. Adair, "who had already pled guilty and was worthless as a witness," and one was a female whom she could never reach. Mr. Adair would have been "badly" impeached by his prior statement if she had called him as a witness, and petitioner did not provide trial counsel with a telephone number for the female witness nor any other contact information for her. As to Mr. Adair, trial counsel recalled that the only thing she received was a handwritten statement from petitioner, which he purported

had been written by Mr. Adair, claiming that neither Mr. Adair nor petitioner were present at the scene. She said that even if Mr. Adair had been willing to testify, it would have been a "silly" strategic move to call him as a witness.

At the evidentiary hearing, the post-conviction court heard arguments from counsel regarding the competency and admissibility of Bryant Adair's testimony. Mr. Adair, who had been a codefendant at trial, was prepared to testify on petitioner's behalf. However, the State brought out that in his own petition for post-conviction relief, Mr. Adair asserted that he was taking several medications, that he was unable to "think on his own," that he suffered from self-mutilating behaviors, and that he had been hearing voices, which instructed him to kill people, since his youth. It was further learned that Mr. Adair had not been taking his medications as prescribed. The post-conviction court allowed Mr. Adair to testify.

Bryant Adair testified that he received a letter from petitioner prior to petitioner's trial requesting that Mr. Adair testify on his behalf. Mr. Adair, however, was already serving his prison sentence in Hardeman County and could not appear on his own volition. He instructed petitioner to contact trial counsel to make arrangements, but trial counsel never contacted him. Mr. Adair opined, "If they would have spoken to me, they would have had me testify then. I mean, they could have probably freed him a little because the fact that he had nothing to do with the robbery and the kidnapping." However, he acknowledged that petitioner was present when the offenses were committed. He explained petitioner's involvement, "He came – he showed up at the door at the place we [were] robbing. He was looking – he said he was looking for weed. So, being that it was a weed man that we [were] robbing, we snatched him in. We [were] looking for the product . . . . " Mr. Adair expounded that the purpose for bringing petitioner inside was to ensure silence outside and prevent being caught.

Mr. Adair confessed that he and nine other people met with the purpose of organizing the robbery. He said that the kidnapping was not planned; he said that "it ended up having to be there because it was the wrong time or whatever." He clarified that petitioner was not at the meeting. He recalled that prior to that time, he and petitioner had an ongoing disagreement and animosity between them.

Mr. Adair stated that when he was arrested, he was caught in a vehicle with his best friend, who was driving. His friend had no part in the robbery and kidnapping. To secure his friend's release, Mr. Adair had to admit to his part in the robbery and had to implicate the other eight people. In his statement to police, Mr. Adair named petitioner as a participant as well as the organizer of the conspiracy. Approximately one year later, Mr. Adair signed an affidavit recanting his prior statement and stated that petitioner had no involvement in the crimes. He said that he was afraid because officers forced him to

"give up" eight names, and while petitioner had nothing to do with the offenses, the people who were involved were not incarcerated.

On cross-examination, Mr. Adair acknowledged that in his statement to police, he told them that petitioner had provided him with the firearm he used in the offenses. However, Mr. Adair said that he "made up all this," meaning his statement. He said that he admitted to his own involvement in the statement but that the problem the detectives had was "who [were] the other eight people." Mr. Adair explained, "I'm an artist, so you ask me to describe a story or paint a picture, I can really do that. So, I mean, making up a story is not hard."

The State called Stacy McEndree, the prosecutor in petitioner's case, as a witness. She clarified that when she worked in the same division as trial counsel's ex-husband, then an assistant district attorney, if trial counsel ever appeared on a case for whatever reason, he would "immediately institute[] a Chinese wall . . . [H]e would not touch [the case] to even write a reset date. He absolutely turned it over immediately and would not touch or entertain or have anything to [do or] to be anywhere near that file."

The post-conviction court denied relief on this claim, stating:

> As required by the Petitioner in order for this Court to consider the prejudicial effect, if any, resulting from the failure to call Adair as a witness, Petitioner presented Bryant Adair as a witness at the post-conviction hearing. Adair testified that while he was in prison, he told the Petitioner to have [trial counsel] contact him so that he could testify on behalf of the Petitioner at trial. Adair testified that had [trial counsel] contacted him, he would have offered testimony that would have "freed [the Petitioner] a little because the fact that he had nothing to do with the robbery and kidnapping." [Trial counsel] concedes that she never contacted Adair, nor set up an interview to consider Adair as a potential witness. [Trial counsel] recalled receiving a handwritten statement from her client, which claimed to be written by Adair, essentially stating that neither Mr. Adair nor the Petitioner were present at the scene of the crime. [Trial counsel] stated she did not call Mr. Adair as a witness because he was the Petitioner's charge partner and he had already pled guilty to the crime, thus rendering him "worthless" as a witness. While testifying at the post-conviction hearing, Adair was impeached by a prior statement that he gave police, which implicated the Petitioner in the crime. Adair provided that his statement to police was false, but after spending time in jail, he now wanted to tell the truth about what happened.

[Trial counsel]'s decision clearly falls within the realm of trial strategy and tactics, and certainly falls within the wide range of reasonable professional assistance. Petitioner's argument that the outcome of this case would have been different had these witnesses testified does not give rise to the level of probability sufficient to undermine confidence in the outcome; it merely speculates a possible effect. Had Adair testified at Petitioner's trial, his prior inconsistent statement would have been used to impeach him, just as it was during the post-conviction hearing, thus making his testimony unreliable and unbelievable. In addition to reliability issues, Mr. Adair could have faced aggravated perjury charges as a result of such testimony. It is also worth noting the possible ethical issues with calling Adair as a witness to testify that the Petitioner had nothing to do with the crime, as the Petitioner had made statements before indicating his desires to plead guilty to his involvement. [Trial counsel] testified that she did not call any witnesses because no one was willing to step forward. Petitioner provided [trial counsel] with various conflicting accounts of what happened during the night of the crime, and [trial counsel] was fully prepared to pursue whatever defense would best fit the evidence that the state presented. Such tactical and strategic choices by [trial counsel] were not unreasonable, therefore Petitioner has failed to show counsel rendered deficient performance. Additionally, Petitioner was not prejudiced by [trial counsel]'s strategic choice to not present such witnesses on his behalf. Petitioner is not entitled to relief on this issue.

With regard to his claim, petitioner specifically argues that trial counsel "failed to investigate and interview relevant witnesses who were willing to provide information and testimony essential to [his] defense" and that her "failure resulted in the denial of critical, exculpatory evidence [that] gravely prejudiced [him]." He also asserts that trial counsel failed to hire an investigator to assist her and that she failed to investigate this or any other theory of the case.

Petitioner gave trial counsel a list containing five potential witnesses, two of whom were fact witnesses – Bryant Adair and Jocelyn Parker. Mr. Adair testified at the evidentiary hearing that petitioner was not involved in the planning or execution of the offenses and that he was at the scene by happenstance. Trial counsel stated that calling Mr. Adair as a witness would have been a "silly" strategic decision because he would have been "badly" impeached by the statement that he gave to police. The decision of whether to call a witness is a strategic decision that we will not second-guess. *See Felts*, 354 S.W.3d at 277. Moreover, any attempt to call Mr. Adair as a witness was thwarted by his defense attorney. We note that hiring an investigator would not have changed this outcome.

-11-

As to Jocelyn Parker, trial counsel stated that petitioner gave her a name but no other contact information. All efforts to find the witness were unsuccessful. When a post-conviction petitioner claims that trial counsel erred by failing to discover, interview or present a potential witness, petitioner should present said witness(es) at the post-conviction evidentiary hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Petitioner has failed to do so. We cannot attribute error to trial counsel for failing to present a witness who petitioner himself did not present. There has been no showing that an investigator would have been successful in this regard.

We agree with the post-conviction court's assessment that trial counsel did not render ineffective assistance in this regard. In addition, petitioner has failed to establish that he suffered prejudice as a result of trial counsel's representation. Petitioner is not entitled to relief on this claim of error.

### 2. Failure to File a Motion to Sever

Petitioner asserts that trial counsel should have filed a motion to sever petitioner's case from that of his codefendants upon receipt of letters from the codefendants professing petitioner's innocence. Accordingly, argues petitioner, he did not receive a fair trial because he could not utilize their exculpatory testimony.

Petitioner stated that he proceeded to trial with two codefendants and that two codefendants entered guilty pleas prior to trial. He said that Mario Morris wanted to testify on his behalf but that he could not because it was a joint trial. He alleged that Mr. Morris executed an affidavit on his behalf but that it could not be introduced because they were tried together. Accordingly, petitioner asserted that his trial should have been severed from the others.

Trial counsel explained that she did not move to sever petitioner's case because "there was no reason to sever. He said he was never there; and then he said he was kidnapped and forced to be there. Between all there was – I had no reason to sever." She recalled receiving a statement purporting to be signed by Mario Morris that read, "I wasn't there on New Year's Eve." It further claimed that petitioner was not there, either. Trial counsel spoke to Mr. Adair's attorney and Mr. Morris's attorney about their testifying for petitioner, but "they laughed" at the proposition. Mr. Adair's attorney indicated that he was unwilling to bring Mr. Adair from the penitentiary to testify.

Ms. McEndree confirmed that all of the codefendants with the exception of Montreal Lyons gave statements about the offenses.

In denying relief, the post-conviction court concluded:

Here, Petitioner asserts that if trial counsel filed a motion to sever the defendants, Petitioner would not have been prejudiced by the other two codefendants that he was tried with. Petitioner argues that because there was no severance, Petitioner could not pursue the defense that cleared him of involvement. Trial counsel made a strategic decision not a file a motion to sever the trial of the Petitioner and the co-defendants. [Trial counsel] testified during the post-conviction hearing that "[t]here was no reason to sever" because the Petitioner had offered conflicting accounts of his involvement. Petitioner first told [trial counsel] he was never at the scene of the crime, but later switched his story alleging that he was kidnapped and forced to participate. This case involved multiple defendants, three of [whom] went to trial together. There were numerous statements given to the police by the defendants, with several statements implicating the Petitioner in the crime. These statements were not introduced at trial, because the defendants were tried jointly. However, if trial counsel would have filed a motion to sever defendants, there is a possibility that some of these statements could have been used at trial, which would have been direct evidence implicating the Petitioner in the crime. Trial counsel made a sound strategic decision to not file a motion to sever and rather have the defendants tried together in order to avoid the introduction of such statements into evidence. Severance was not necessary to achieve a fair determination of the guilt or innocence of the Petitioner, nor was severance necessary to protect the Petitioner's right to a speedy trial. Petitioner has not demonstrated that [trial counsel]'s performance was deficient. Additionally, Petitioner was certainly not prejudiced by the failure, as the decision not to sever was potentially helpful to Petitioner's case. Accordingly, Petitioner is not entitled to relief on this issue.

The record does not preponderate against the post-conviction court's findings. Indeed, one or more of the codefendants' statements potentially could have been used against petitioner had he stood trial individually. Moreover, as noted above, defense attorneys for both Mr. Adair and Mr. Morris declined to allow their clients to testify for petitioner; in fact, both attorneys "laughed" at the proposition. There has been no showing that they would have permitted their clients to testify in an individual trial had petitioner's case been severed from the others. Petitioner is not entitled to relief on this claim.

### 3. Failure to Have Petitioner Sentenced Under the Pre-2005 Sentencing Act

Petitioner claims that trial counsel rendered ineffective assistance by failing to have him execute an *ex post facto* waiver to be sentenced under the 2005 amendments to

the Sentencing Act or, in the alternative, to secure his sentencing under the pre-2005 amendments. He fails to allege any error, aside from positing that the issue shows the "gross carelessness of trial counsel." He does not assert that the result would have been different or that he was prejudiced by trial counsel's oversight.

At the evidentiary hearing, petitioner alleged that trial counsel argued the wrong sentencing statute. He claimed that on direct appeal, this court acknowledged that the wrong statute had been applied but that trial counsel failed to preserve the issue and it did not merit plain error relief. He compared his direct appeal with that of Mario Morris, whom he claimed received appellate relief on the same issue. Trial counsel acknowledged that there was a change in the sentencing statute from the time that petitioner was sentenced to the time that his codefendants were sentenced.

The post-conviction relief court concluded that the issue had been previously determined:

> Petitioner claims that [trial counsel] was ineffective for failing to execute an *ex post facto* waiver to have him sentenced under the 2005 amendments to the sentencing act or in the alternative to have him sentenced under the pre-2005 amendments. Any constitutional issue that has been previously determined against the petitioner by another court in a prior proceeding cannot be raised in a general post-conviction proceeding. A ground for relief is said to be previously determined if it was addressed on the merits by a court of competent jurisdiction after a full and fair hearing, at which the petitioner was afforded the opportunity to call witnesses and present evidence . . . . The Petitioner need not have actually presented evidence at the prior hearing; it is sufficient if he was afforded the forum . . . . [Trial counsel] testified that this issue was argued on direct appeal to the Criminal Court of Appeals because there was a change in the sentencing laws between the time the Petitioner was sentenced and the time his co-defendants were sentenced. The [Court of Criminal Appeals] addressed this issue and affirmed the decision of the trial court, stating:
>
>> In the present appeal, the defendant's argument in his reply brief, as we have set out, is that since he committed his crimes before the enactment of the 2005 amendments to the sentencing law, was sentenced after that date, and the record on appeal does not contain a waiver of his *ex post facto* rights, he must be resentenced. The defendant does not argue that we should make a plain error review of his sentencing. It is clear that, even if this court makes a plain error review of the defendant's sentencing, he is not entitled to relief. One of the

enhancement factors applied by the trial court was the fact that the defendant had a previous history of criminal convictions in addition to those necessary to establish the appropriate range. Thus, since this enhancement factor is applicable both before and after the amendment to the 1989 Sentencing Act and the defendant does not claim that it was inapplicable, it is not necessary that we consider the defendant's claims in this regard to do substantial justice, and a plain error review is not appropriate . . . .

[*Khalfani Marion*, 2008 WL 2262317, at *9.] This ground for relief was previously determined and the Petitioner is not entitled to relief on this issue.

The record supports the post-conviction court's findings. "A ground for relief is said to have been 'previously determined' when 'a court of competent jurisdiction has ruled on the merits [of the grounds] after a full and fair hearing.'" Tenn. Code Ann. § 40-30-112(a). Not only was the issue previously determined, *see Caruthers v. State*, 814 S.W.2d 64, 70 (Tenn. Crim. App. 1991) (citing Tenn. Code Ann. § 40-30-112(a)), it is also meritless, as concluded by this court on direct appeal, *Khalfani Marion*, 2008 WL 2262317, at *9. Petitioner cannot obtain relief on this claim.

### 4. Failure to Object to Trial Court's Refusal to Charge Facilitation as a Lesser-Included Offense

Petitioner posits that trial counsel had a duty to object to the trial court's refusal to charge facilitation, even if it would have been overruled, and the failure to do so corresponds with a "failure to advocate" for him. In addition, he contends that trial counsel was ineffective for requesting a jury instruction on criminal responsibility but failing to request a jury instruction on facilitation. The State responds that petitioner is "incorrect in his insistence that defense counsel was deficient for failing to make a meritless objection."

At the evidentiary hearing, petitioner maintained that trial counsel improperly asked the trial court to instruct the jury as to criminal responsibility, which, he opined, was "a defense for the State." Petitioner stated that trial counsel erred by failing to request an instruction on facilitation as a lesser-included offense, given that criminal responsibility was also charged. Trial counsel recalled that criminal responsibility was charged to the jury but she did not recall whether the judge considered charging facilitation as a lesser-included offense.

The post-conviction court concluded that

-15-

[t]he trial judge is under a mandatory duty, without request, to give the jury proper instructions on the law applicable to the evidence adduced during the course of the trial. However, this mandatory duty does not require that the trial judge give more than basic, fundamental instructions. If a party is dissatisfied with the instructions proposed or given by the trial judge, Tennessee law provides a mechanism by which attorneys can request the judge to charge additional or different jury instructions. The trial judge should refuse to give any special request which is not applicable to any theory of the case developed by the evidence.

While the trial court transcript is admittedly confusing with regard to whom initially requested the instruction for criminal responsibility, it is immaterial as to who requested the instruction, as the trial judge was under a duty to give the instruction as it was applicable to the evidence adduced during the course of the trial. During the second discussion of the charges, however, it was the prosecutor, Stacy McEndree that requested confirmation that the court was going to instruct on criminal responsibility. The Petitioner was not prejudiced on this issue because the jury would have heard the instruction regardless of which attorney requested it.

Next, Petitioner contends that [trial counsel] was ineffective because she failed to object to the trial court's failure to instruct the jury on the offense of facilitation, which is a lesser-included offense of criminal responsibility. With regard to the facilitation charge, the trial court clearly stated[:]

> For the record, with regard to that, there is case law that says when the Court charges criminal responsibility, then [the] Court should charge facilitation. After a review of the proof that the Court has heard, it's the opinion of the Court that no reasonable jury could find that based upon the testimony that there was anybody, of the three, that was guilty of the offense of facilitation. In which specifically says that they're conscious and aware that a crime is occurring but without any desire or intent to participate, give aid or assistance. And based upon the testimony that the Court has heard, I think the jury could find each of the defendants guilty as charged of each of the offenses, either under the theory of criminal responsibility or under the theory of being directly involved. However, I don't see any proof whatsoever that would lead a reasonable jury to find a verdict of facilitation

-16-

under the law as this Court understands facilitation to be. And, in fact, if a jury were to return a verdict of facilitation, I'm not sure that is could stand based upon the proof. Therefore, the Court is of the opinion to the extent that it will not charge facilitation, because I do not believe that a reasonable jury could return a verdict of that offense that would stand under the proof if it were to find somebody guilty of that. So, therefore, I will not charge facilitation.

Petitioner has not shown that [trial counsel] was deficient, as any objection by [trial counsel] clearly would have been overruled by the trial court due to the court's certainty that no reasonable jury could find that based upon the testimony that there was anybody, of the three, that was guilty of the offense of facilitation. Petitioner was therefore not prejudiced and is not entitled to relief on this issue.

The evidence does not preponderate against the post-conviction court's findings. Petitioner was questioned about an excerpt of the trial transcript that indicated that trial counsel either suggested or acquiesced in the trial court's decision to charge criminal responsibility. However, from that excerpt it is impossible to know the context surrounding trial counsel's statement, *i.e.*, whether it was a request or an indication of agreement. This court will not presume error from a silent record. As the post-conviction court noted, while the circumstances surrounding trial counsel's statement was unclear, it is of no consequence because during the second charge conference, the prosecutor requested the jury charge on criminal responsibility.

Moreover, the post-conviction court properly concluded that petitioner cannot establish prejudice because based upon the trial court's ruling, any objection to the exclusion of a jury charge on facilitation as a lesser-included offense would have been futile. When no evidentiary basis supports a facilitation conviction, trial counsel's failure to request the instruction will not be deemed deficient performance. *Bryant v. State*, 460 S.W.3d 513, 525 (Tenn. 2015). Petitioner is not entitled to relief on this claim.

### 5. Failure to Introduce Evidence of Petitioner's Mental Health History and and Alleged Incompetence to Stand Trial

Petitioner argues that trial counsel rendered ineffective assistance by failing to introduce evidence that he was incompetent to stand trial because, even after he wrote to her explaining his previous mental health hospitalizations, she did not secure for him a mental health evaluation or request copies of his records.

-17-

At the evidentiary hearing, petitioner claimed that trial counsel failed to file necessary motions in his case. He maintained that he was not competent to stand trial and that he wanted trial counsel to introduce records from his two previous hospitalizations at MMHI. She declined to do so. He stated that trial counsel was aware that he was taking prescription medications but that she failed to utilize that information. He testified, "She got put in a bind because she figured that she had it all figured out through her husband, so she didn't have to put in no work. So when that trial transferred to Division X, it was so less of time [sic] for her to do some work that she couldn't get to it."

Petitioner clarified that he was hospitalized at MMHI for paranoid schizophrenia three times and that each one lasted approximately two months. He said that he suffered from that condition even when he was not at MMHI. His symptoms included hallucinations, talking to himself, and "basically talking to God in a normal fashion."

The post-conviction court denied relief, stating:

Petitioner contends that trial counsel was ineffective for failing to offer evidence that the petitioner was incompetent to stand trial. Petitioner testified that he wrote [trial counsel] a letter stating that he was not competent to stand trial and that he had been hospitalized twice for his mental state. Petitioner alleges that [trial counsel] did not present such evidence because she did not prepare to offer it due to her reliance on her husband getting petitioner off on a deal. A mental health evaluation was conducted on the petitioner in March of 2005 and he was deemed competent to proceed with the disposition of his charges. The only other history the petitioner had was a substance abuse problem, which potentially could have been damaging evidence if presented to the jury. Petitioner has not demonstrated that trial counsel was deficient or that he was prejudiced. Petitioner is not entitled to relief on this issue.

We agree with the trial court. Petitioner underwent a mental health examination that established his competence to stand trial. With regard to trial counsel's alleged malfeasance in failing to procure and introduce petitioner's mental health records from his previous hospitalizations, we cannot attribute error to trial counsel. The record from the post-conviction hearing is silent as to trial counsel's investigatory actions pertaining to said records; however, petitioner failed to present his mental health records and/or a mental health expert to testify about the significance thereof. *See Black*, 794 S.W.2d at 757. Petitioner is without relief.

-18-

### 6. Failure to Advise Petitioner of the State's Plea Offer and His Potential Sentence Exposure

Petitioner avers that trial counsel failed to inform him of the State's plea offer and did not advise him of his potential sentence exposure in the event of a conviction.

At the evidentiary hearing, petitioner denied that trial counsel explained his criminal exposure prior to trial. Petitioner "believed" that he was offered a plea, but he was at MMHI when it was extended. He said that he was away during "basically" every court date, so he did not know what was transpiring in his case. He claimed that in 2005, he heard through his family and a codefendant that he was offered a thirteen-year plea but that trial counsel never communicated it to him. However, he did not ask trial counsel about it, either.

Trial counsel stated that a plea offer was made in petitioner's case and that she communicated the offer to petitioner "every time" they were in court. She recalled that the plea was "thirteen, thirteen[point]-five." She explained petitioner's sentence exposure to him and encouraged petitioner to take the plea offer because "unless everything he told [her] was just an outright lie, they were going to find him guilty, and if they found him guilty . . . then it would be greater exposure." However, petitioner insisted upon going to trial because "[h]e kept saying everybody would say he wasn't there." She advised petitioner that if the State's witnesses appeared and testified consistently with their statements, "there was nothing that [they] could do."

Pertinent to the defense strategy at trial, counsel posited that she "went to trial with several defenses. None of them were defensible." She recalled that petitioner gave "a couple of conflicting theories, which could not all be true." First, he maintained that he was not there and that he had no involvement with the offenses. Next, he told her that no one at the scene could identify him. Finally, petitioner told trial counsel that he had been kidnapped and coerced into participating but that when he was there, he did not do anything.

The post-conviction court heard the testimony of witnesses and obviously credited the testimony of trial counsel, ruling:

> Petitioner alleges that trial counsel did not inform him of any offer from the state and did not discuss his potential exposure if he pursued a trial rather than take the deal. Petitioner testified that [trial counsel] only informed Petitioner's family and never directly told Petitioner of any offer from the state. Petitioner stated that he learned of the offer from his parents and co-defendants. Additionally, Petitioner testified that [trial counsel] did not inform Petitioner that he could face up to thirty-eight years if he went to

trial. [Trial counsel], however, testified that she did in fact inform Petitioner about the offer. [Trial counsel] testified that she informed Petitioner of the offer "several times" and encouraged him to take the deal because of what his exposure could be if he went to trial. [Trial counsel] stated that the Petitioner had provided her with several conflicting accounts of what happened on the night of the crime, and the plea deal was the better option in her opinion because of the weakness of the Petitioner's defenses. [Trial counsel] testified that it was the Petitioner's decision to go to trial because he was confident that the victims would not identify him. Petitioner has merely made accusations and presented no evidence of deficiency on part of [trial counsel]. Petitioner is not entitled to relief on this issue.

On appeal, we will not reassess the post-conviction court's determination of the credibility of witnesses, which is a matter entrusted to the post-conviction court judge as the trier of fact. *Dellinger*, 279 S.W.3d at 292; *R.D.S.*, 245 S.W.3d at 362 (citation omitted). The post-conviction court made a credibility judgment based on the testimony of petitioner and trial counsel. Absent evidence to the contrary, we will not disturb this judgment. Petitioner's claim must fail.

7. Failure to Impeach the State's Witnesses on Their Identification of Petitioner

While acknowledging that trial counsel challenged both victims, on cross-examination, about their ability to identify petitioner, he nonetheless claims that trial counsel was ineffective because she failed to "offer up any contradictory accounts made by the alleged victim."

At the evidentiary hearing, trial counsel said that after the victims testified, the only remaining viable defense theory – of the myriad theories petitioner supplied – was that the witnesses could not identify him in court because, as petitioner said, "they were crack whores." However, trial counsel stated that when the witnesses appeared in court, "they were fine . . . . [T]hey were as upstanding as anybody [she had] seen in a courtroom." Both witnesses identified petitioner in court and both testified that "they begged [petitioner] to take them outside before they killed them so the children wouldn't hear." With that testimony, trial counsel opined that their case was "shot dead right there."

When asked about the State's witnesses at trial, trial counsel said:

I remember the two women who were held to the ground with guns at their heads. I remember them very well, and I remember having been promised, by my client, that they were, as I said, essentially crack whores. They didn't come in looking like that; and in my entire career, I've never

had a witness bring their own protection to court; but these women did. They were that scared.

Trial counsel recalled that during her opening statement, her position was that the State could not establish petitioner's guilt because it could not prove identity. However, she said, "[T]hat kind of went to hell." She "leaned on" one of the witness's identification of petitioner that said the picture "resembled" him. She cross-examined one of the victims with her own statement, but trial counsel said the witness was "extremely consistent." Trial counsel described, "She was stalwart on the witness stand, and she made a lot more sense than people in most serious cases have made . . . . This one was not going to go down."

Ms. McEndree opined that during trial counsel's closing argument, she pursued the best defense Ms. McEndree thought petitioner had, which was challenging the victims' identification of him. She said that trial counsel attempted to "shed doubt" on one identification based on the fact that one of the victims circled petitioner's photograph on the array and wrote that he "resembled" one of the perpetrators. She characterized the defense that trial counsel mounted as "just one defense, start to finish, by questioning whether or not [petitioner] was really involved in any way at all."

Ms. McEndree stated that both witnesses were "adamant" in their identification of petitioner at trial. Both witnesses made clear that petitioner was a "very active participant" in the offenses at both victims' houses. She said, "He wasn't taking orders from the others."

The post-conviction court discounted this claim, holding:

> Petitioner claims that [trial counsel]'s representation of Petitioner was deficient because she failed to impeach the State's witnesses regarding their identification of the Petitioner with their prior statements to police. Both victims identified the Petitioner at trial and specifically recalled his participation in the crime. On cross-examination, [trial counsel] did in fact challenge the first victim, Elisha Wilkins, about her ability to identify the Petitioner. [Trial counsel] also challenged the second victim, Latonya Cooper, on cross-examination about her statement that the Petitioner merely "resembled" one of the men that came into her home that night. Petitioner has not demonstrated that [trial counsel]'s performance was deficient, nor has the Petitioner shown that he was prejudiced. Again, both victims pointed to Petitioner and were extremely confident with their recollection of the specific acts that the Petitioner participated in on the night of the crime. Petitioner is not entitled to relief on this issue.

We agree with the post-conviction court. Trial counsel ably cross-examined the witnesses, but as she said, one of the witnesses was "stalwart" in her testimony, and both witnesses appeared to be "as upstanding as anybody" she had seen, not the "crack whores" that petitioner made them out to be. Moreover, petitioner has failed to produce the "contradictory accounts" for which he faults trial counsel for not utilizing. He is not entitled to relief.

8. Failure to Present Mitigating Evidence at the Sentencing Hearing.

In general terms, petitioner maintains that trial counsel erred in failing to present mitigating evidence at his sentencing hearing. He claims that his family members were present and would have testified on his behalf about his mental health issues and past drug abuse.

Petitioner recalled that at his sentencing hearing, his entire family was present in addition to another witness. He said that trial counsel offered no proof, no mitigating evidence, and none of his mental health records. He had undergone several mental health hospitalizations and claimed to have had letters from the hospitals to introduce as evidence. Petitioner said that he had used illegal drugs and wanted that fact introduced in support of his mental condition. On cross-examination, petitioner acknowledged that his codefendants received a longer sentence than he had. He admitted that he had a prior criminal record.

Trial counsel stated that she did not call any witnesses at petitioner's sentencing hearing. She said that his parents were perhaps present to testify but that their testimony would have been "to no avail." She confirmed that prior to trial, she sought a mental health evaluation for petitioner and that the results were that he was competent to stand trial. She requested the evaluation because petitioner's parents had asked for it. She denied that petitioner requested that she obtain hospitalization records from MMHI.

Trial counsel explained that the "only mitigating thing" that was presented at trial was that one of petitioner's codefendants instructed him to kill a little boy but instead, petitioner returned the child to his room.

Petitioner also called Henry Archer, petitioner's step-father, as a witness at the evidentiary hearing. He said that he had advised trial counsel about petitioner's drug and alcohol problems. He confirmed that he was present at petitioner's sentencing hearing and was willing to testify.

The post-conviction court noted petitioner's failure to establish prejudice in this regard:

Petitioner argues that trial counsel's representation was deficient because she did not offer any mitigating evidence at the sentencing hearing. Petitioner contends that members of his family were present and ready to testify on his behalf at the sentencing hearing. Petitioner stated that his family would have testified to his mental issues and past drug abuse. However, Petitioner was deemed competent to go to trial, and any information presented by his family members could potentially open the door to damaging testimony on cross-examination. Additionally, testimony about his history of drug abuse could have been another aggravating circumstance, rather than mitigating. Petitioner has not shown he was prejudiced and is not entitled to relief on this issue.

The evidence does not preponderate against the post-conviction court's findings. Again, petitioner has failed to present evidence and/or testimony, aside from Mr. Archer, regarding his mental health issues or drug problems. As the post-conviction court noted, evidence of petitioner's drug use could have easily been more damaging than helpful at sentencing. While Mr. Archer testified in vague terms about petitioner's mental health issues, without more, we agree with trial counsel that calling him as a trial witness would have been futile. Petitioner cannot succeed on this claim of error.

## CONCLUSION

Upon our review of the record, the briefs of the parties, arguments of counsel, and applicable legal authorities, we affirm the judgment of the post-conviction court.

_____
ROGER A. PAGE, JUDGE

-23-